(80 N. W. Rep. 805.)

---

ESTHER M. CAMERON *vs.* GREAT NORTHERN RAILWAY COMPANY.

Opinion filed October 31, 1899.

**Injury to Railroad Employe—Evidence.**

 Evidence examined and *held* that the trial court properly directed a verdict for the defendant.

Appeal from District Court, Grand Forks County; *Lauder, J.*

Action by Esther M. Cameron against the Great Northern Railway Company. Judgment for defendant and plaintiff appeals.

Affirmed.

*Bosard & Bosard,* for appellant.

The question of defendant's negligence was·for the jury. *Cameron* v. *Great Northern Ry. Co.,* 8 N. D. 124; 12 Am. & Eng. R. R. Cas. 520; *Northern Pacific Ry. Co.* v. *Herbert,* 116 U. S. 642; *Brann* v. *Railway Co.,* 36 Am. Rep. 243; *Cincinnati, etc., Ry. Co.* v. *McMullen,* 117 Ind. 439. It will be presumed that deceased was in the exercise of due care at the time of the accident, there being no eye witness to the accident and no evidence to the contrary. *Cameron* v. *Railway Co.,* 8 N. D. 124. It will not be presumed that the servant assumed the risk of operating the defective car, or was guilty of contributory negligence in the absence of proof that he had knowledge of the dangers of the service. *Chicago, etc., Ry. Co.* v. *Hines,* 23 N. E. Rep. 121. The fact that a servant knows the defective condition of the instrumentalities with which he works,

does not necessarily charge him with contributory negligence, unless he understands the risk to which these defects expose him. *Woutila* v. *Duluth Lumber Co.,* 33 N. W. Rep. 551; *Clark* v. *Railway Co.,* 9 N. W. Rep. 581; *Russell* v. *Railway Co.,* 20 N. W. Rep. 147; *Cook* v. *Railway Co.,* 24 N. W. Rep. 311. If a prudent person would not have believed the defects dangerous, he may disregard them without losing his right to complain if he suffers from the defect while pursuing his ordinary course. *Colorado, etc., Ry. Co.* v. *Ogden,* 3 Colo. 499; *Burlington, etc., Ry. Co.* v. *Liehe,* 17 Colo. 280; *Scanlan* v. *Railway Co.,* 18 N. E. Rep. 209; *Ferren* v. *Railway Co.,* 9 N. E. Rep. 609; *Williams* v. *Churchill,* 137 Mass. 243; *Thorpe* v. *Railway Co.,* 2 S. W. Rep. 3; *Patterson* v. *Railway Co.,* 76 Pa. St. 388; *Snow* v. *Railway Co.,* 8 Allen, 450. The question of deceased's negligence should have been submitted to the jury. *Mahoney* v. *Dore,* 30 N. E. Rep. 366; *Fitzgerald* v. *Company,* 29 N. E. Rep. 464; *Pomeroy* v. *Inhabitants,* 28 N. E. Rep. 899; *Phelon* v. *Inhabitants,* 28 N. E. Rep. 899; *Ferren* v. *Railway Co.,* 143 Mass. 73; *Dewise* v. *Bailey,* 131 Mass. 169; *Donahoe* v. *Railway Co.,* 83 Mo. 560; *Pitts* v. *Railway Co.,* 27 S. E. Rep. 189; *Railway Co.* v. *Michaels,* 46 Pac. Rep. 938.

*W. E. Dodge,* for respondent.

The removal of the steps from the rear platform of the sleeper "Benton" was not the cause of Conductor Cameron's death; but the evidence in this record conclusively establishes the fact that his death was caused by falling, or being thrown, from the rear end of the platform while engaged in adjusting the air valves under the center thereof. No jury could predicate a finding upon the evidence to support the plaintiff's contention as to the cause of Cameron's death. *Philadelphia, etc., Ry. Co.* v. *Schertle,* 2 Am. & Eng. R. R. Cas. 158; *Peter Orth* v. *Railway Co.,* 47 Minn. 384; Bailey's Masters' Liability, 503 & 508; *Koslowski* v. *Thayer,* 63 Minn. 150; *Moore* v. *Railway Co.,* 67 Minn. 396. Conductor Cameron received and accepted this train at Minot, North Dakota, the initial point in his journey, with notice and knowledge of the fact that the steps in question had been removed. He undertook to take the car, in its defective condition, to the end of his run. He undertook thereby to represent the company in the transfer and delivery of this car and to make the same safe for the traveling public and subordinate employes. He assumed all the hazards and risks incident to its transfer and delivery in the condition in which it was, and was known by him to be, and his representatives cannot recover even if he so far forgot his contract, his duty, and the known danger, that he unlocked the door and unfastened the gate and walked off into space and met his death. *Puffer* v. *Railway Co.,* 68 N. W. Rep. 39; *Clark* v. *Railway Co.,* 28 Minn. 128; *Kelly* v. *Railway Co.,* 35 Ill. 106; *Patterson's* Accident Law, 344; *Wood's* Master and Servant, 680-718; *Gibson* v. *Railway Co.,* 63 N. Y. 449;

*Haden* v. *Manufacturing Co.,* 29 Conn. 548; *Devitt* v. *Railway Co.,* 50 Mo. 302; *Baylor* v. *Railway Co.,* 40 N. J. L. 23. It may fairly be presumed that a servant knows the condition of machinery and appliances which his contract of employment requires him to inspect, which he has constant opportunity to inspect, and which his regular duties bring under his notice. 1 Sherm. & Redf. on Neg. 216; *Railroad Co.* v. *Marker,* 41 Ark. 543; *Sheets* v. *Sheldon,* 103 N. Y. 667; *Brossman* v. *Railway Co.,* 113 Pa. St. 490; *Houston, etc., Ry. Co.* v. *McNamara,* 59 Tex. 255.

WALLIN, J. This action was tried to a jury and the trial court after the evidence on both sides was submitted, directed a verdict in favor of the defendant. This ruling is the only error assigned in this Court. · The case is now before this Court for a second time. In the first appeal there was a similar order,—directing a nonsuit,— which order, however, was based wholly upon the plaintiff's testimony; no evidence being offered in that trial for the defense. *Cameron* v. *Railway Co.,* 8 N. D. 124, 77 N. W. Rep. 1016. It appears further that the case has been tried three times. The first trial resulted in a verdict for the plaintiff, which verdict was set aside, and a new trial granted, by the trial court. At the last trial, by stipulation of counsel, the evidence, or a large part thereof, as taken down at the first trial by the stenographer, ·was read to the jury, and hence the defendant's evidence is now, and for the first time, before this Court for consideration. It therefore becomes necessary, to a proper understanding of the case, not only to refer to the facts as stated in the opinion of this Court as reported in the case cited, but to make a new and supplementary presentation of the facts as they are found in this record. For an outline of the facts we refer to the opinion already cited, but for a fuller presentation of the case we will make a resume of the evidence as it now stands in the record.

This action is for the recovery of damages for the alleged negligence of the defendant, which, as is claimed, caused the death of Edward J. Cameron, who was the husband of the plaintiff. The precise grounds of the alleged negligence are, in effect, that the defendant furnished the deceased with a train of cars—to be run and operated under the supervision of the deceased as conductor—which was unsafe, imperfect, and inadequate, in this: That the steps on the left-hand side of the rear end of the sleeping car at the rear end of the train were broken, and had been removed prior to the delivery of said train to the deceased at Minot on the day he was killed; and that said broken and unsafe condition of the train was known, or could have been known, to the defendant, by the exercise of ordinary care and diligence; but that the said condition of the train was unknown to the deceased. It is further alleged that while the deceased was in the discharge of his duty as conductor of the train, and by reason of defendant's alleged negligence, the deceased, while said train was moving at great speed, was cast upon the ground, and killed. The complaint further avers that "there was

a gate upon the platform of said car where said steps aforesaid had been removed that could have been easily and conveniently closed and fastened, whereby the said car could have been easily and conveniently rendered safe, which fact was well known to the defendant, but the defendant neglected to cause said .gate to be closed· and fastened." It will be noticed that the alleged negligence does not embrace a statement that the train in question, or the sleeping car in question, or any of the machinery or equipment of the train or said sleeper, were defective, unsafe, or inadequate, except only that the steps on the rear end of the rear sleeper, on the left side, were broken and removed. These averments in the complaint narrow the questions of fact to be determined here to an inquiry—First, whether the train in question, when the same was delivered to deceased, contained a rear sleeper with steps broken and removed, as alleged; and, if this is answered in the affirmative, whether the defendant then knew that the steps were broken and removed; and, third, whether the deceased was informed of this condition of the steps by the defendant when he was given charge of the train, and hence knew of its unsafe condition; and, finally, whether the deceased was killed by falling from the train through the opening caused by the removal of the steps, or in some other manner. The additional evidence now before this Court enables us to do what was impossible on the former appeal, namely, to answer all the questions of fact which we have above propounded except that which has reference to the .exact manner in which the deceased lost his life; and, in the view we have taken of the case and of the evidence before us, we shall be able to make a final disposition of the case without decisively passing upon the question of fact which involves the place and manner in which the deceased was killed. In our opinion, the controlling facts of the case are established conclusively by the undisputed testimony in the record. Such facts, in our judgment, are fairly stated in the brief filed in this Court by the respondent's counsel, and we shall therefore utilize a portion of the facts so stated, as follows: "The decedent was, at the time of his death, a passenger-train conductor in defendant's employ, and had been so engaged for several years. On the 17th day of November, 1894, he was killed by falling or being thrown from a passenger train of the defendant, then in his charge as conductor. The accident occurred in the County of Grand Forks, North Dakota, about midway between the station of Arvilla and the next station, situated about seven miles east of Arvilla, named 'Emerado.' The accident occurred between 6:43 and 6:52 p. m., and at a time when the train was running at a high rate of speed. The train was east-bound, and was the regular Pacific coast passenger train, consisting of nine cars, and running between Seattle, Washington, and St. Paul, Minnesota, via the Montana Central Railroad between Butte and Havre, Montana. One of the stations on the Montana Central through which the train passed was Great Falls. The train reached Grand Forks, North Dakota, at 7:25 p. m., where the conductor was first

missed, and, on being searched for, his body was found at the place before indicated. It was nothing unusual for steps to be broken and removed from the platform of cars in transit, and such cars were received by the conductors of the company at Havre, Montana, and taken east, as often as once a month. Such cars having broken steps were never taken out of the trains in transit for repair, there being no intermediate repair shops for such repairs between the Pacific coast and St. Paul; but were in every instance retained and continued in the train by the conductors in charge, and taken to the shops at St. Paul for repair. It is the undisputed testimony of the conductors, brakemen, and porters that they never knew of one single instance, where the steps were broken off a car or cars in transit, of such car or cars being taken out of a train, or left at an intermediate point for repair. On the 16th day of November, 1894, when the train in question reached Great Falls, on the Montana Central road, there was standing on the depot platform a large baggage truck, loaded with baggage; and just as the train to which the sleeper Benton was attached was backing into the depot the wind set this truck in motion, and in going off the platform it struck and broke the steps on the left-hand side of the above-named sleeper, and the broken steps were removed, and the fastening bolts thereof · laid on the rear platform of the sleeper, and the car came east without the steps being replaced. This train was received by Conductor Lyon at Havre, Montana, a junction between the Montana Central and Great Northern, and was in good condition, except that these steps on the north side of the rear platform of the rear sleeper Benton had been removed as aforesaid. Conductor Lyon and his brakeman fastened the iron gate on the north side of the rear platform of the sleeper Benton at Havre, although it was not fastened when he received the train. The rules of the company relative to the conduct, duties, and responsibilities of passenger conductors— Nos. 259, 266-268, 300, 301, and 306—are marked 'Exhibit D,' " and were put in evidence, and, we think, properly. "Rule 306 is as follows: 'They [passenger conductors] must examine and know for themselves that the brake shafts and attachments, ladders, running boards, steps, handholds, and other parts and mechanical appliances which they are to use are in proper condition before using. If not, report them to the proper parties, that they may be put in proper condition before using.' These rules have all been in force by the company, and have regulated the conduct of its conductors, since 1890. They were in force at the time of the accident, and formed a part of the code of rules prepared and published by the company on the first of that year in its book of rules, which was delivered to each passenger conductor in the employ of the company on the first day of that year. Passenger-car conductors were compelled to have one of these books before they were allowed to enter upon their duties, and Conductor Cameron, the decedent, then had one. The rear platform of the sleeper Benton was about five feet wide across the car and about three feet the other way. It was guarded at the

rear by an iron rail supported by iron stanchions, and across the center by a chain guard. In the center of the platform between the stanchions there was placed," on the evening in question, "a large bull's-eye lantern or signal light, which was tied with a rope to the guard chain or stanchion. Iron gates about three and one-half feet high, when closed, shut in this platform on the sides, and prevented ingress and egress to the platform by way of the steps leading thereto. These gates swung from the car to the railing out to close and in to open. An iron hinge, with a joint in the center, constituted the fastenings for these gates ordinarily. These hinges were fitted with a joint on the gate, another on the car, and one in the center, half way between. As the gate closed, the hinge straightened out, so that the gate could not be opened without forcibly lifting or raising the hinge in the center by applying the hands to the hinge. These gates, when closed, are inside the steps, so that a person on the platform could not pass down the steps without first opening the gates by raising the hinge. At Minot, North Dakota, Condutcor Lyon turned over the train to the decedent, Cameron, at 11:15 a. m. In turning over a train by one conductor to another, it was customary for the conductor turning over the train to tell the one receiving it of any defect in the train or in the appliances, so that he might note it in his conductor's record book. In turning over the train in question at Minot, Conductor Lyon notified the decedent of the condition of the steps. Mr. Lyon testified: 'In turning over that train, I told Conductor Cameron that the steps were broken at the rear end of the sleeper Benton,—the Butte sleeper,—on the north side. At the time I told him, he was walking up toward the sleeper on the platform. I went with him to the end of the car,—the end of the sleeper Benton, the rear end, on the right hand side. He stepped down on the track, and looked at it, and said, "he guessed it would be all right." "He went round, probably pretty near the track,—a little way over half way across the track behind the train. He just looked around at the steps; looked at the gate, and came back. The gate was closed at the time. I can't say whether there was a rope on it at that time or not, but it was closed, and I don't remember about noticing about the rope at that time. He and I were alone. We had no other conversation about the train more than usual.' Rule 268 provides that when receiving a train at a terminal station 'conductors must make a memoranda of all cars composing their trains, examine the brakes, couplings, and safety chains, signal cords, etc., so as to know, as far as practicable, if everything is in order, before starting,' etc. The rear brakeman under the decedent when he received and accepted the train in question at Minot was Francis B. Skinner. He also made a report to the decedent of the condition of the steps. His evidence need not be detailed, as it is the same in substance as that of the conductor Lyon. O. D. Claybourn, the porter on the car Benton, testifies: 'I had a conversation with Mr. Cameron that day about the rear platform and the steps, after we left Minot, between Burwick and

Devils Lake. He came back to get the tickets. He asked me how the accident occurred, and I told him. He told me about the back door; to keep it locked, and to watch it. This was at the same place at the same time I told him how the accident occurred. Special cars go over the road once, and sometimes twice, a month, on these trains. They have the same protection to the platform as the sleeper in question; so that when you open the gates, similar to those on the sleeper Benton, with the train moving, there are no steps. The platforms on those cars are exactly the same as the platforms of similar cars without steps." In other words, the testimony shows that it was not unusual for passenger cars to be conveyed in passenger trains over this line with the steps removed from one or more platforms; that private and business cars were constantly conveyed with platform similar to that on the rear end of the sleeper Benton, protected in the same manner, and equally as dangerous to train operatives, since, when the gates to the sides of the platform were opened by the lifting of the hinges, any operative might walk off into space; that it was the duty of a conductor turning over a train at a terminal point to another conductor to notify him of the condition of the train, and this duty arose out of custom and the rules of the company; that it was likewise the duty of the conductor receiving such train not only to heed such instructions, but to personally inspect and know the condition of the steps, and at terminal points, and whenever opportunity offered, to inspect and know the condition of such appliances; that Conductor Lyons, in obedience to custom and rules, did, upon turning over the train to Conductor Cameron, notify him that these steps had been removed; that Conductor Cameron accepted the train with such knowledge, and said he thought it would be all right if the rear door was kept locked and the gate closed; that his brakeman—Skinner—noted the absence of the steps, and reported the same to him on the depot platform at Minot; that Cameron appeared as one who had been informed of the fact before; that he never suggested to him the propriety of tying the gate, or fastening it in any way other than by the hinge; simply said, 'We will keep the gate closed, and the door locked with the coach key, so that passengers cannot get out on the rear platform;" that the decedent afterwards talked with the porter, Claybourn, who gave him the details of the accident, whereupon the conductor said that he should keep the door locked, and watch it; that the decedent knew that the custom and rules of the company required him to know that the steps had been removed from the north side of the rear platform of this car, and that he, as conductor, if he deemed it unsafe, ought to report it to the proper representatives of the company for repairs, or make it safe, as it was easy to do by tying, chaining, or locking, if he did not deem the hinge sufficient.

Despite the contention of the appellant's counsel to the contrary, we shall hold that there is no substantial conflict in the evidence which establishes the facts as thus far narrated. Counsel for the

respondent claims and contends that the evidence also establishes the following facts conclusively: First, that the train was equipped with air brakes, which were governed by the engineer by means of an air pipe running under the cars; second, that on the afternoon in question the air brakes were not acting properly, and were sticking, and that the train had been delayed thereby at Larimore and at another point west of the place of the accident; third, that the deceased, shortly before the accident, had been searching through the train for the cause of this sticking of the brakes; fourth, that the conductor, after the train passed Arvilla, passed out of the rear door of the sleeper and onto the platform for the express and avowed purpose of looking after the cause of the difficulty with the brakes; fifth, that a valve or appliance attached to the air brake was located under each car, and a few inches to the right of the center, and that it was sometimes proper and necessary, in looking for leaks in the air brake, to examine such appliance, and that this could be done by getting down and reaching over the end of a rear car, and that conductors and train men were in the habit of doing this in prosecuting a search for the cause of a leak in the air pipe; sixth, that the gate in question was not only closed, but that the same was securely tied with a rope by the car porter soon after the train started from Minot, and that it continued so tied, and was tied when the train passed the place of the accident and when it reached Grand Forks. Upon these assumptions of fact counsel strenuously argues that the evidence points conclusively to the fact that the deceased lost his life while engaged in leaning over the rear end of the platform in search for the cause of the leak in the air pipes, and consequently that he was not killed by passing out through the gate in question, as claimed by the plaintiff.

We have carefully considered the evidence bearing upon the several propositions of fact last enumerated, and we are inclined to the view that all of them are established by a preponderance of the evidence; but we are unable to accept the view of counsel that there is no evidence whatever which tends to dispute these facts. This is especially true as to the important question of whether the gate was or was not tied with a rope at the point where the accident occurred. There being some conflict in the evidence upon this matter of fact, it would have been the proper course to submit such questions to a jury for determination, were it not for other facts which control the case, and which were conclusively established by undisputed testimony. We are entirely convinced that the facts in the record completely refute the plaintiff's charge that the deceased came to his death through the negligence or wrongful acts of the defendant, and our opinion would not be different if the evidence showed beyond dispute—as it does not—that the deceased passed out of the gate in question to his death. It appears that the deceased not only was the conductor of the train, and as such in charge of it, and of the subordinate trainmen upon it, but it further appears

that his authority was plenary and absolute with respect to accepting the train as safe and adequate. No other person shared this responsibility with the deceased. His authority and duty required him to make a careful inspection of the train delivered into his keeping with reference particularly to the question of its adequacy and safeness as a train for the transportation of passengers and employes who were to take passage upon it. He had full power, under the rules and instructions of the defendant, to inspect the train, and to reject any car which, in his judgment, was unsafe; and, if the car in question was unsafe, it was his imperative duty to exercise such power and authority by promptly rejecting the car or by making it safe. The defendant was bound to furnish a safe train for the transportation of passengers and the men who were to handle the train, but the defendant was compelled to act through employes in the discharge of its obligations to the public and its employes, and the defendant employed the deceased, who was a conductor of long experience, to inspect the train in question, and determine whether it was or was not a safe and adequate train. The deceased was the one man upon whom the duty to inspect was devolved. Nor can we assent to the proposition that the representative of the deceased can recover damages which may have resulted from a failure of the conductor to discharge the duty of inspection. But in this case the undisputed evidence shows that the conductor was informed at Minot as to the injury to the steps, and that he personally examined the passageway, and after such examination he accepted the train with the broken steps, and said he guessed it would be all right. He was again informed of the condition of the steps by the brakeman and the car porter, and then gave no direction to tie the gate, but simply directed the porter to keep the rear door of the sleeper locked, and watch it. The deceased, therefore, did inspect the train, and did discover the defective steps, and after such inspection accepted the train and used' it, but did not at any time either tie the gate or direct that it should be tied, despite the fact that the gate was tied with a rope when it came into Minot. The complaint charges that the defendant failed to tie and securely fasten this gate, and this averment embodies the specific act of negligence charged against the defendant. But it is too obvious for discussion that, if the omission to tie the gate under the circumstances was negligence, then the person whose duty it was to tie it or cause it to be tied was the identical person who was guilty of such negligence. If the car was unsafe for the use of passengers and trainmen, it was the special duty of the conductor either to make it safe or to reject it from the train. The complaint charges that it could have been conviently made safe by securely fastening the platform gate, and all the evidence shows that the car would have been safe and adequate for all on board the train if this precaution had been taken. Upon this state of facts we hold without hesitation that no recovery can be had by the plaintiff on account of the negligence charged. This action can only be maintained

in cases where the deceased could have himself recovered damages for the same injury if it had not resulted fatally. See Tiffany, Death Wrongful Act, § 63, and cases cited. If the deceased had been injured, but not killed, he could have recovered damages only by showing that his own neglect had not contributed to the injury. This would be impossible to do under the evidence in this case. No action will lie for injuries caused by negligence in a case where the only negligence complained of is that of the plaintiff himself, and certainly a plaintiff cannot recover where his own want of due care is the direct, efficient, and sole cause of the injury. In disposing of the case we have had occasion to apply to the facts in the record only well-established principles of the law of negligence, and, as these are elementary, and familiar to the profession, we deem it unnecessary to cite cases in their support. Under the undisputed evidence the plaintiff cannot recover. The judgment for the defendant must be affirmed. The other judges concurring.